In re RECOMMENDATION OF LOCAL ADVISORY BOARD FOR MIAMI DEFENSE-RENTAL AREA FOR DECONTROL OF (MIAMI BEACH et al.)

No. 496.

United States Emergency Court of Appeals
Heard at Miami, Feb. 9, 1949.

Decided Feb. 16, 1949.

Reconsideration Denied Feb. 25, 1949.

Joe Creel, of Miami, Fla., for the Local Advisory Board for the Miami Defense-Rental Area.

Charles P. Liff, Chief Atty., Appeals Section, of Washington, D. C. (Ed Dupree, Gen. Counsel, Office of the Housing Expediter, of Washington, D. C., on the brief), for Housing Expediter.

Edward L. Blackman, of New York City (Arthur D. Frishman, of Brooklyn, N. Y., on the brief), for Miami Beach Apartment Ass'n, Inc., amicus curiæ.

William L. Flacks, of Hollywood, Fla., for the Apartment and Hotel Ass'n of Hollywood, Hallandale, and Dania, Florida, amicus curiæ.

Burnett Roth, of Miami, Fla., dissenting member of the Local Advisory Board, amicus curiæ.

Robert D. Ross, of Miami, Fla., for Miami-Miami Beach Tenant League, amicus curiæ.

Before MARIS, Chief Judge, and McALLISTER and LINDLEY, Judges.

MARIS, Chief Judge.

After public hearings duly advertised and held on October 25, 26, and 27, 1948, the Local Advisory Board for the Miami Defense-Rental Area recommended to the Housing Expediter (a) that the portion of the Miami Defense-Rental Area comprising the municipalities of Miami Beach, Surfside, Bal Harbour, and Bay Harbor Island be decontrolled, and (b) that the portion of the Miami Defense-Rental Area comprising the municipalities of Hollywood and Hallandale be decontrolled. At the same time the Board voted not to recommend the decontrol of the entire Miami Defense-Rental Area or of that portion of it comprising the City of Miami. The Housing Expediter, having disapproved the two recommendations thus made by the Local Board, transmitted them together with a transcript of the proceedings had by the Board to this court on January 17, 1949. He transmitted therewith a copy of his letter to the Board disapproving its recommendations and certain additional information or evidence in support of his action. Pursuant to the provisions of Section 204 (e) (4) of the Housing and Rent Act of 1947, as amended, 50 U.S.C.A.Appendix, § 1894(e) (4), the recommendations came on for hearing and consideration by this court on February 9, 1949, at which time rebuttal evidence in the form of three affidavits was adduced by the Local Board with leave of court and full argument was had by counsel for the Local Board, the Housing Expediter and various organizations and individuals who were given leave to appear as amici curiæ.

At the outset it should be emphasized that this is a court created by act of Congress, 50 U.S.C.A.Appendix, § 924 (c); we have no power except as granted by Congress; our jurisdiction to hear and decide cases before us is strictly limited by Congress. We are not arbiters between landlords and tenants, or between local boards and the Housing Expediter at Washington. We have no discretion as to whether rent control should be continued or ended. Even though we might disagree with the wisdom of the policies of the local boards or the Housing Expediter, we could not, even though we wished, substitute our personal judgment as to what is best for the community, for the views of the local boards or the Housing Expediter. This court can follow no policy except the policy announced by Congress. That policy is defined by Congress itself in the Declaration of Policy set out in Section 201 of the Housing and Rent Act of 1947, 50 U.S.C.A. Appendix, § 1891, in which it is stated that "The Congress hereby reaffirms the declaration in the Price Control Extension Act of 1946 that unnecessary or unduly prolonged controls over rents would be inconsistent with the return to a peacetime economy * * *" and that "The Congress therefore declares that it is its purpose to terminate at the earliest practicable date all Federal restrictions on rents on housing accommodations," at the same time recognizing "that an emergency exists and that, for the prevention of inflation and for the achievement of a reasonable stability in the general level of rents during the transition period, * * * it is necessary for a limited time to impose certain restrictions upon rents charged for rental housing accommodations in defense-rental areas." This, then, was the policy of Congress—"to terminate at the earliest practicable date all Federal restrictions on rents on housing accommodations."

To carry into effect this policy, Congress provided for local advisory boards in each defense-rental area. These local boards constitute the keystone of the Congressional policy of decontrol. From being merely bodies advisory to the ·Housing Expediter under the Housing and Rent Act of 1947 their functions were greatly enhanced by

the amendments made by the Housing and Rent Act of 1948. As we pointed out in the Matter of Recommendation of Local Advisory Board of the San Antonio Defense-Rental Area, Em.App., 169 F.2d 955, 958:

"Now they exercise administrative or quasi-legislative power more than merely advisory in character. They are entrusted with primary responsibility for initiating and conducting formal proceedings looking toward general adjustments of maximum rents, or decontrol in whole or in part, within their respective defense-rental areas. Their recommendations along these lines must be approved or disapproved by the Housing Expediter within thirty days. If such a recommendation is 'appropriately substantiated and in accordance with applicable law and regulations',—as specifically defined in the act—the Housing Expediter is directed to approve the same and to take prompt action to carry such recommendation into effect. If the Housing Expediter disapproves the recommendation, his action is no longer final. It is provided that if the Housing Expediter 'does not approve such recommendation within thirty days after the date of its receipt by him, he shall, within five days after the expiration of such thirty-day period' file the case in the Emergency Court of Appeals. Further, the act provides that if the court 'determines that the recommendation is not in accordance with law or that the evidence in the record before the court, including such additional evidence as may be adduced before the court, is not of sufficient weight to justify such recommendation, the court shall enter an order disapproving such recommendation; otherwise it shall enter an order approving such recommendation.' Our action in the matter must be taken 'within thirty days' after the case has been filed in this court by the Housing Expediter '(or within such additional period of not more than thirty days as the court may find necessary in exceptional cases).' Finally, any recommendation of a local board as to decontrol or as to a general adjustment of maximum rents within the area, if an order of disapproval thereof has not been entered by the Emergency Court of Appeals within the brief time limit prescribed, 'shall be carried out by the Housing Expediter.'

"In the 1948 amendments Congress also deliberately prescribed more specifically the make-up of these boards in order to insure their representative character. It provided that each such board must 'consist of not less than five members who are citizens of the area *and who, insofar as practicable, as a group are representative of the affected interests in the area,* to be appointed by the Housing Expediter, from recommendations made by the respective Governors.' (Italics added.) Congress evidently attached primary importance to the corporate judgment of such local boards so constituted, and regarded them as pre-eminently fitted to determine, after full public hearing, and in accordance with the statutory standards, whether there should be an adjustment of the level of maximum rents or whether the time had come for decontrol within the area."

Having thus in mind the Congressional policy for the termination of rent control and the importance which Congress evidently intended to be attached to the recommendations of the local boards we turn to the consideration of the recommendations now before us. In support of these recommendations the Miami Local Board made the following findings:

"The evidence taken at such public hearings reflects that a different condition existed in the City of Miami Beach, Surfside, Bal Harbour and Bar Harbour, Hallandale and Hollywood, as against the condition that existed in the remaining portion of the area. This remaining portion continues to show a housing shortage. The aforementioned cities are tourist communities and the evidence discloses that a great many of the housing units are exempt from control by virtue of what is known as 'tourist and winter seasonal exemption,' under Section 1B1 VI and VII of Miami Housing Regulations. These housing units in Miami Beach, Surfside, Bal Harbour and Bar Harbour, Hallandale and Hollywood, are not being rented to year-round tenants because such rental would operate to return such housing units to control. As a consequence, the evidence reflects that there

are a great many vacant housing units in Miami Beach, Surfside, Bal Harbour, Hallandale, Hollywood and Bar Harbour. If these vacant housing units were decontrolled, they would be available for rental on a year-round basis, and from the evidence submitted, at a rental not greatly in excess of existing rentals.

"Therefore, it is the view of this Board that should these areas be decontrolled, there would be no housing shortage in Miami Beach, Surfside, Bal Harbour, Bar Harbour, Hallandale, Hollywood and Bar Harbour." [1]

The first question with which we are confronted is whether the evidence in the record before us is of sufficient weight to justify these findings. Basically the findings are three:

(1) that the municipalities recommended for decontrol are tourist communities in which there are a great many housing accommodations which under the present rent control regulations are being kept vacant for rental to tourists only and are not being rented to permanent tenants because such rental would operate to return such housing accommodations to rent control,

(2) that such vacant housing accommodations are sufficient in number so that if they are made available for rental to permanent tenants there will be no housing shortage in the communities in question, and

(3) that the decontrol of these communities will result in these vacant housing units being made available for permanent tenants at rentals not greatly in excess of existing rentals.

Considering the first of these basic findings, the evidence is clear and it is indeed a matter of common knowledge that all the municipalities recommended for decontrol are primarily and pre-eminently tourist communities. They fall into two distinct groups geographically. This is doubtless the reason for the two recommendations. Miami Beach is a world famous winter tourist resort which occupies one long and comparatively narrow island and a group of smaller islands adjacent thereto lying between the Atlantic Ocean and Biscayne Bay opposite the City of Miami. Surfside and Bal Harbour occupy the northern end of the principal island on which Miami Beach is located, and Bay Harbor Island lies immediately to the west of Surfside and Bal Harbour. All three are quite small and, while separate municipalities in law, are geographically and economically integral parts of Miami Beach. All four are in Dade County. Hollywood and Hallandale, on the other hand, are two resort communities which adjoin each other in Broward County. The southern line of Hallandale is more than five miles north of the northernmost limit of Bal Harbour. Hollywood is much the larger of the two and what is true with respect to the characteristics of that community is, we think, equally applicable to adjoining Hallandale.

The evidence further establishes that in each of these two groups of tourist communities there are a great many housing accommodations which are kept vacant except when rented to tourists and that this is true because the owners believe that the rental of such accommodations to local residents would return them to rent control and thereby make difficult, if not impossible, their subsequent exemption and rental to tourists at uncontrolled rents. Not only is this belief widespread among owners of rental property in these communities but we think it is well based in view of the law and the regulation. Section 1(b) (vii) of the Controlled Housing Rent Regulation for the Miami Defense-Rental Area which provides for the exemption of certain housing accommodations in resort communities in the Defense-Rental Area when rented to tourist tenants stipulates that the exemption shall apply to such accommodations only while rented to tourist tenants. Accordingly, if such accommodations are rented to local residents, the ex-

[1] The reference in the Board's findings to "Bar Harbour" was conceded at the hearing to be erroneous and it was stated that the correct name of the municipality referred to is "Bay Harbor Island." The reference in the quotation to "Section 1B1, VI, and VII" of the Controlled Housing Rent Regulation for the Miami Defense-Rental Area should have been to "Section 1(b) (vi) and (vii)."

emption automatically ceases and the accommodations immediately become subject to the restrictions imposed by the Housing and Rent Act of 1947 upon the eviction of a tenant. This means, as a practical matter, that if such a housing accommodation is leased to a local resident he cannot thereafter be evicted against his will for the purpose of renting to a winter tourist. In such a regulatory set-up it is inevitable that owners of tourist housing accommodations who hope to seure the large seasonal rents from winter tourists which the regulation permits them to get if their accommodations are vacant, will not take a chance on tying up those accommodations by rental to local residents at present controlled rental rates.

■ We think that the second finding is also supported by the evidence. In the very nature of things growing resort communities, such as these, must have within their borders housing accommodations largely in excess of the number of families permanently living therein. If this were not so the communities would obviously not be able to provide winter tourists with the accommodations which they desire. Moreover in both Miami Beach and Hollywood a great amount of new housing construction has taken place in recent years. The result is that in these communities the number of housing units, excluding hotel rooms, largely exceeds the number of families permanently residing therein. Accordingly the evidence sustains the conclusion that if even a modicum of the housing accommodations in these communities which are held vacant in the summertime for tourist rental are made available for rental to local residents there will be no housing shortage therein.

■ This brings us to the last of the findings, namely, that decontrol would make these vacant units available for rental by local residents on a year-round basis and would do so at rentals not greatly in excess of existing rents. We think the evidence clearly supports the first part of this finding, that is, that decontrol would bring many of these presently withheld housing units into the rental market for local residents. It is obvious that the winter tourist rental business involves a substantial element of risk. It is, of course, wholly dependent upon the tourists who come each year to seek relief from the rigors of northern winters. It is obvious that if in a given winter a large number come south the tourist season will be good and owners of tourist accommodations will do well, but that if only a few come many accommodations will go begging. Necessarily the climatic and economic factors which determine the extent of winter tourist travel are wholly beyond the control of owners of housing accommodations in Miami Beach and Hollywood. The testimony accordingly indicates that if owners were in a position to bargain for and obtain an annual rental from a local resident more nearly commensurate with that which they might expect to obtain from tourists in the winter season, and if they were assured of the right to evict the local resident if he proved to be an unsatisfactory tenant, many of them would choose to take the assured annual rental offered by the local resident instead of running the risk involved in holding their properties vacant for a larger but more uncertain winter tourist rental. Indeed the evidence is that this would be true with respect to more than 5,000 apartments now held for tourist rental in Miami Beach alone.

The Board found, however, that not only would decontrol throw a great many of the withheld housing units into the rental market but also that it would do so at rental rates "not greatly in excess of existing rentals." It must be conceded that the evidence upon this last point is quite conflicting. The Housing Expediter strongly urges that the weight of the evidence does not support the finding but indicates that if the Miami Beach and Hollywood areas are decontrolled rental rates will very greatly increase above the present controlled level. We have given careful consideration to the evidence as to this question and our conclusion is that the weight of the evidence supports the finding that decontrol of these communities will bring into the permanent rental market for local residents a great many housing accommodations now held solely for tourist occupancy, the rents of which will be fixed

by competitive bargaining between tenants and owners at levels not greatly in excess of existing rentals.

Having thus concluded that the findings of the Board are supported by the weight of the evidence we turn to the question whether those findings are sufficient in law to support the Board's recommendations for the decontrol of the Miami Beach and Hollywood areas.

The first point to be considered is whether the Board was justified in considering and recommending decontrol of these particular tourist communities separately and apart from the City of Miami and the remainder of the Miami Defense-Rental Area. The Housing Expediter strongly urges that they both constitute integral parts of the Miami metropolitan area and that they may not be treated separately. We do not agree. As contrasted with the City of Miami, which is a large commercial and industrial as well as residential center, the communities recommended for decontrol are pre-eminently resort communities designed for the accomodation, service, and entertainment of winter tourists. Not only are they independent municipalities from a legal standpoint but they are in fact detached and independent communities geographically and in large part economically as well. It is true that they are close to the City of Miami and that means of frequent and speedy public transportation exist between them. It is also true that many persons employed in Miami Beach reside in Miami where lower priced housing accommodations exist. But this is inevitable in view of the fact that Miami Beach has been built up as a resort community of luxurious and therefore necessarily expensive housing accommodations. In the case of such a community the necessary service employees would largely, even in the absence of rent control, find housing in other places, or have housing or its money equivalent provided for them by their employers. Certainly it is not reasonable to suppose that Congress intended to transfer the economic burden of providing low-cost housing for these employees from the employers who profit from their services to the owners of housing accommodations in the resort community whose accommodations happen still to be subject to rent control. The Local Board, composed of representative citizens of the area, concluded that independent consideration not only could but should fairly be given to these resort communities. We think that their judgment with respect to this peculiarly local problem is to be given great weight. Moreover, our independent consideration of the evidence satisfies us that the facts support the Board's action in this regard.

The Housing Expediter's principal point in support of his contention that the Board's findings do not support its recommendations, however, is that the findings do not meet the test laid down by the Act for decontrol. He refers to Section 204(e) (1) (A) which is as follows:

"(e) (1) * * * Any local board may make such recommendations to the Housing Expediter as it deems advisable with respect to the following matters:

"(A) Removal of any or all maximum rents in the area, or any portion thereof, over which the local board has jurisdiction, or with respect to any class of housing accommodations within such area or any portion thereof, if in the judgment of the local board the need for containing maximum rents in such area or portion thereof or with respect to such class of housing accommodations no longer exists, due to sufficient construction of new housing accommodations or when the demand for rental housing accommodations has been otherwise reasonably met; * * *."

Conceding, as we held in the Matter of Recommendation of Local Advisory Board of San Antonio Defense-Rental Area, Em.App., 169 F.2d 955, 960, that the Board's findings do not have to be in any prescribed form if they contain the substance of what is required, the Housing Expediter nonetheless contends that the standard laid down by the Act necessarily requires a finding in some form that the demand for rental housing accommodations has been reasonably met *at or before* the time the Board makes its recommendation. Upon this premise he asserts that a finding such as was made in this case that the existing shortage of housing accommodations available to local residents will disappear

*after* decontrol is ordered does not meet the statutory standard. We think that the Housing Expediter takes too narrow a view of the standard which the Act here lays down. If by virtue of new construction or otherwise there exist in a community more than enough housing accommodations to meet the demands of all local residents if they were offered for rental to such residents, and if it appears that only the provisions of the Housing and Rent Act and the regulation issued thereunder are operating to keep them off the rental market so that upon decontrol they would become available at reasonable rentals to those who need them, we think that the statutory standard has been met. To hold otherwise would be to say that decontrol may not be ordered in a situation in which it appears that it is the operation of rent control and that alone, rather than the scarcity of housing units, which is prolonging the housing shortage in the community. We think it is quite certain that Congress did not intend any such result as that. We conclude, therefore, subject to the determination of the point next to be discussed, that the Board's findings do indicate that the Miami Beach and Hollywood areas have met the statutory test for decontrol.

As we have suggested, one point remains for consideration before we can finally conclude that the statutory test has been met. The Board found, as we have seen, that upon decontrol in the Miami Beach and Hollywood areas a great many housing units now held vacant for tourist tenants will become available for rental on a year-round basis "at a rental not greatly in excess of existing rentals." We have already pointed out that we regard the weight of the evidence as supporting this finding if it be regarded, as we think it must be, as determining that upon decontrol the rent level for housing accommodations in these communities for all year-round rental will not rise unreasonably.

 The Housing Expediter urges, and we think rightly, that the statutory authorization for decontrol when the demand for rental accommodations has been reasonably met does not contemplate a situation in which, although an adequate number of housing units are available from a numerical standpoint, it appears that they are in rental ranges wholly out of line with the needs of the community for housing accommodations. Indeed we have heretofore suggested as much ourselves.[2] At the hearing in the present matter counsel for the Housing Expediter stated that in the view of the Housing Expediter the demand for rental housing is reasonably met when the renting public is able to bargain in a competitive market to obtain housing accommodations of the character needed. Stated somewhat more fully, he said, the need for rental housing accommodations has been reasonably met when scarcities have been reduced to a point where there are sufficient housing accommodations available of the character required so that tenants and landlords may bargain in a reasonably competitive rental market and when the removal of controls will not result in unreasonable rent increases with resultant inflationary effects.

 We find ourselves in agreement with the definitions thus given on behalf of the Housing Expediter. There are basically two points involved. The first is whether the demand for rental housing accommodations may be regarded as having been reasonably met, within the meaning of the statute, by the mere numerical increase in the available housing accommodations without regard to their character, size or rental ranges. To state this question is, we think, to answer it. Obviously the demand for rental housing accommodations on the part of the entire population cannot be met by the coming into the rental market of mansions and luxury apartments alone. There must be such a variety of dwelling houses and apartments, small as well as large, as are reasonably required to meet the housing needs of the people who live in the community. This, as we understand it, is what the Housing Expediter means by housing accommodations "of the character needed" and it is what we had in mind in referring to "classes of

---

[2] In re Recommendation of Local Advisory Board of San Antonio Defense-Rental Area, Em. App., 169 F.2d 955, 960.

housing accommodations" in our opinion in the Matter of Recommendation of Local Advisory Board of San Antonio Defense-Rental Area, Em.App., 169 F.2d 955, 960.

The second basic question is whether the needed housing accommodations must be available at the existing level of controlled rents in the area. It will be observed that the Housing Expediter does not take this view. He says that the demand for housing accommodations may be regarded as reasonably met, within the meaning of the statute, if sufficient housing accommodations exist and upon decontrol will be available at rentals not unreasonably in excess of existing levels. Accordingly he concedes that, if only reasonable rent increases are likely to result, the statute requires that a local board's recommendation for decontrol must be approved. We agree with this view. It is well to remember, however, that we are here dealing not with a determination of existing fact but rather with a prediction of things to come. Obviously no precisely accurate determination of the extent to which the rent level will rise in the future if decontrol should be ordered can ever be made. Such a finding necessarily involves at bottom the opinion of the fact finder as to the proper appraisal of the factors which will enter into the predicted result. Likewise the determination of the point at which an increase in the rent level must be regarded as unreasonable is one of opinion rather than fact. In the light of these considerations it will be seen that the application of the Congressional standard to a particular defense-rental area cannot be based upon a precise mathematical formula but involves a wide application of discretion and judgment. It is obvious that there must be an upper limit to what may be regarded as a reasonable rise in the rent level following decontrol but neither Congress in stating the statutory standards nor the Housing Expediter in his interpretation of them has given us any indication as to what that upper limit is. The standard, however, is one with which the local boards must deal and we are left merely with the Congressional direction that decontrol may be recommended "if in the *judgment* of the local board the need for continuing maximum rents * * *

no longer exists * * * when the demand for rental housing accommodations has been * * * *reasonably* met." [Italics supplied.] It thus appears that Congress intended to leave this question to the informed and considered judgment of the local boards.

It is argued that the upper limit of the Congressional concept of reasonableness would be the point at which rents took their relative place in the customary price pattern of the community as it existed prior to rent control. It is suggested that it would be unreasonable to assume that in an uncontrolled economy rents alone of all commodities and services would remain at the levels of 1942. It is urged, on the contrary, that a realistic view would lead one to expect that when the housing scarcity in a community is overcome and decontrol is ordered the existing level of controlled rents will rise somewhat and the general level of the rents of all housing accommodations, those theretofore controlled as well as those theretofore exempt, will ultimately tend to stabilize, as the result of bargaining between tenants and owners, at a level not relatively higher than that reached during rent control by other commodities and services in the community. However this may be, we think that the Board's finding in this case, which is, as we have suggested, in reality the considered prediction of an informed group of responsible local citizens, that the rent levels in the Miami Beach and Hollywood areas following decontrol will not greatly exceed the existing levels, must be taken to be a determination that the expected rise in those rent levels which will then come about will not be an unreasonable one within the meaning of the law. Our conclusion accordingly is that the recommendations of the Board, substantiated as they are by its findings and the evidence which supports those findings, are in conformity with the standard set by the Act. The recommendations must, therefore, be approved unless it appears that they have not been made in accordance with the procedural requirements of the Act. In this connection the Housing Expediter urges that the Board has failed in three respects to follow the required procedure in making the present recom-

mendations. We, therefore, turn to a consideration of these objections.

 The first is that the vote by which the recommendations were adopted was taken by secret ballot. It is conceded that no record was made in the minutes of the Board of the votes of the individual members and that only the total vote of nine in favor and six against the recommendations was recorded. We think there is much force in the Housing Expediter's present contention that the votes cast by the members of a local advisory board upon a proposed recommendation for decontrol should be open and public. The fact remains, however, that although, as we have heretofore pointed out,[3] the Housing Expediter has full authority to issue instructions to the local boards prescribing the manner in which they shall perform their functions under the Act and although he has in fact issued such instructions in the form of his "Handbook for Rent Advisory Boards," he has not issued an instruction requiring that the vote upon recommendations for decontrol shall be open and public or that the vote of each member shall be recorded in the minutes. Not having issued such an instruction as would clearly have been within his power to do he has left the local boards at large with respect to the manner in which the vote upon a recommendation shall be taken and recorded. Accordingly we cannot hold that the Board in this case failed to conform to the procedure required by the Act when it provided that the vote upon the recommendations now before us should be taken by secret ballot.

 The Housing Expediter's next procedural objection is that two members of the Board who were not present at the meeting on December 6, 1948, at which the members' votes were received were permitted to cast their ballots in absentia. We think that this objection is well taken. In our view the Act and the instructions issued thereunder in the Housing Expediter's Handbook clearly contemplate that recommendations of the kind we are here considering may only be adopted at a regularly held session of a local board at which a quorum is present and only by the vote of the members present at the session at which the action is taken. In other words neither the Act nor the instructions contemplate that members of a local board may vote upon a recommendation if they are not present at the meeting at which the vote is taken. Accordingly in determining the procedural validity of the recommendations now before us the votes of board members Warfield and Wilson which were cast in absentia must be rejected. By reason of the secrecy of the vote it is impossible to determine from the record whether these members voted for or against the recommendations. Accordingly in deciding whether a sufficient number of votes were cast in favor of the recommendations we must assume that both members voted with the affirmative majority and we must subtract their votes from that majority. It follows that for the purposes of this proceeding the vote of the members present at the meeting of December 6th upon the recommendations was seven in favor of the recommendations and six against them. It will be seen that this is still a majority of the thirteen members present at the meeting, who constituted more than a quorum, but it is two less than a majority of the entire membership of sixteen.

 The Housing Expediter's final contention is that the recommendations are procedurally defective for want of the affirmative valid votes of nine members, a majority of the entire membership of the Board. In this connection the Housing Expediter relies upon a suggestion made in our opinion in the Matter of Recommendation of Local Advisory Board of San Antonio Defense-Rental Area, Em.App., 169 F.2d 955, 958, that there is much to be said for the proposition that to constitute valid board action a recommendation must be concurred in by a majority of the entire membership of the Board. We did not so decide in the San Antonio case, however, since it was not necessary for us to do so. As we there pointed out the Housing Ex-

---

[3] In re Recommendation of Local Advisory Board of San Antonio Defense-Rental Area, Em.App., 169 F.2d 955, 959;

In re Jamestown Defense-Rental Area, Em.App., 171 F.2d 708.

pediter himself in the instructions contained in his Handbook did not impose such a requirement but merely directed that a "decision by a majority of the members voting, assuming a quorum is in attendance, constitutes valid action of the board." We cannot hold that this specific procedural direction by the Housing Expediter was an abuse of the discretionary power confided in him by Section 204(d) of the Act. It is, therefore, controlling upon the point now raised, and unless and until it is modified by him so as to impose the requirement that a recommendation shall be concurred in by a vote of a majority of all the members of the board, the Housing Expediter is hardly in a position to raise this particular objection. We conclude that the recommendations now before us are not only appropriately substantiated but also procedurally in accordance with the law.

An order will accordingly be entered approving the recommendations of the Local Advisory Board for the Miami Defense-Rental Area for the decontrol of the municipalities of Miami Beach, Surfside, Bal Harbour, Bay Harbor Island, Hollywood and Hallandale.